### John Dubose v. The State.

1. Accomplice Testimony.— If the inculpatory evidence consists of or substantially depends upon the uncorroborated testimony of a State's witness, and he is shown to have been an accomplice in the perpetration of the offense, a conviction cannot legally be had. And a reasonable doubt as to the complicity of the witness operates the same effect.

2. Same — Practice.— The defense is not confined to positive or direct evidence of the complicity of the State's witness, but may establish it by any character of evidence which would be admissible if the witness himself were on trial for the offense.

3. Circumstantial Evidence — Threats of Third Persons against Deceased.— In a trial for murder the inculpatory evidence was circumstantial, except the testimony of a State's witness against whom there was some proof of complicity, and the contested issue was the identification of the defendant as the assassin. He proposed to prove that the State's witness was at enmity with the deceased, had threatened his life, and carried weapons for him; but, on objection, the proof was excluded. *Held,* that the proposed proof was competent in this state of case, and its exclusion was error. Otherwise, however, had it not proximately tended to exculpate the defendant, and thus distinguished the case from *Boothe* v. *State,* 4 Texas Ct. App. 202, and others in which the proof only tended to show malice of the third party against the deceased. See the opinion *in extenso* on the question.

4. BURDEN OF PROOF — CHARGE OF THE COURT. — The jury were instructed that "in every criminal prosecution the accused is presumed innocent until his guilt is established by legal evidence, and the burden of proof rests upon the State and does not shift till the State has proved, to the satisfaction of the jury, the facts which constitute the offense charged; and when this is done it devolves upon the accused to establish the facts upon which he relies to excuse or justify the prohibited act." *Held* erroneous because it in effect shifts the burden of proof and requires that the defendant shall, on his plea of not guilty, prove his innocence.

5. SAME. — When no special plea or independent exculpatory fact is relied on by the accused, and he confines his defense to a traverse of the issues tendered in the indictment, the burden of proof never devolves on him.

APPEAL from the District Court of De Witt. Tried below before the Hon. H. C. PLEASANTS.

The indictment charged the appellant with the murder of one James Benton, in De Witt county, on the 15th day of October, 1875.

Mr. Noltke testified for the State that he lived in De Witt county, about three quarters of a mile from the camp of Benton, the deceased. About 8 o'clock, A. M., on the morning after the killing, James Montgomery came to the house of witness and told him that deceased had been killed, and the two rode down to the camp to see the body. The body was lying on a pallet made of saddle blankets, with the feet towards and near the camp-fire. The bed-clothing was burned as high up as the deceased's hips. There were two wounds in the head which seemed to have entered from behind, and these wounds were powder-burned. One of these shots passed entirely through the head. The witness found neither bullets nor cartridge shells anywhere about the camp. There was another pallet at the camp which seemed to have been occupied by some other person during the night. The witness saw no person about the camp while he was there other than Montgomery, who went with him. The camp

was in the forks of Edwards' and Clear creeks, about 30 or 40 steps from the banks of the former, and about 300 yards from the banks of the latter. The witness was at home on the night of the killing. He did not know where the defendant lived at that time.

On cross-examination, the witness stated that he examined for horse-tracks, but found none nearer the body than 15 or 20 steps. Grass was growing about the camp where the body lay. The camp-fire was burning a little, and the witness thought that the deceased had struggled into the fire after being shot, and by that means set the bedding and his clothes on fire. There was nothing over the body, and nothing to indicate that any one else had been in the camp the night before, except that the pallet appeared to have been occupied by two persons. The deceased had no shepherd. The witness saw no arms about the camp,— nothing but a few cooking utensils, some provisions and a few blankets.

The witness had just moved on the day of the night of the killing, and slept in his house for the first time on that night. Robert Riddle lived near the witness on the same tract of land. The witness did not see him on that day nor the next, nor does he recollect of seeing W. C. Bacquet on that or the next day. Riddle's house could not be seen from that of witness, and Bacquet and Riddle might have been about the latter's house without the witness knowing it. The witness saw no one going to Riddle's on the day after the killing. He knew nothing of a herd of cattle being camped in the vicinity.

J. Casprizk testified for the State that he lived between one quarter and a half a mile from the camp of deceased when the killing occurred. Between 9 and 10 o'clock he heard four shots from the direction of the camp, and supposed that deceased was firing to frighten something away. The first two shots were fired in quick succession and the other two after a lapse of a few minutes. The

deceased, who had been with his sheep, came to witness'
field about an hour before sun-set on the evening before
he was killed, and talked awhile.    Next morning about
8 or 9 o'clock Mr. Montgomery came to witness' house
and asked where the deceased's camp was.    Witness
showed him and he went in that direction.    After
getting near the camp he called back to witness to join
him quick, saying that the deceased was dead.    The wit-
ness joined him, and both, though frightened, went up
to examine the body, but did not touch it.    The wit-
ness went back to his work, but "kept his eye" on the
camp, and saw no one go there until the justice of the
peace came.    The witness saw no one about the camp the
evening before.    Did not know defendant at the time nor
where he lived.

On cross-examination the witness stated that he had
lived near the camp of the deceased about two months,
and was on friendly terms with him.    The deceased some-
times visited the witness' house.    He had no shepherd
at the time of the killing, nor did the witness know that
he had ever had one.    The shots spoken of by the witness
were not fired before 9 o'clock.    The last two shots
were not so loud as the first two but all sounded like pis-
tol shots.    The witness could not say that all of the four
shots were fired from the same pistol.    Besides his son,
the witness had two men living with him at the time of
the homicide.    One of these men left a day or two after
the killing, and the other five or six days after.    The
witness had not finished his work, but had told them he
had nothing further for them to do.    One of these men
went to the Coleto and the other to San Antonio.

The deceased told the witness, on the evening before he
was killed, that he owed James Montgomery about $250,
and would try to pay him the next day.    He told witness
at the same time that he intended to go to Cuero that
day, but had changed his mind.    The witness occupied

the evening before the killing in plowing, and saw no one but his workmen and deceased. The deceased told the witness that he had had a "falling out" with Robert Riddle at the old place (Riddle's house), and that was the reason of his leaving Riddle's and moving to this camp. He had been in the camp three or four weeks. The witness did not see Riddle on the day before or on the day after the killing. Riddle has since been killed. The witness observed a herd of cattle in the vicinity on the morning after the killing, and saw three men, whom he did not know, ride down to the body from the herd, and ride off before witness, who desired to speak to them, could do so. The witness did not know the defendant or Wm. Bacquet at the time of the killing. He knows the latter now, but does not know whether or not Bacquet has been paid to testify in this case.

William C. Bacquet, a witness for the State, testified that the defendant told him on the morning after the killing, that he, the defendant, had killed the deceased on the night before. He describes the circumstances of the confession substantially as follows: The witness was herding his brother's sheep on the prairie the morning after the killing. Robert Riddle came to him, and, after talking a while, and seeing that his sheep were going to shade, he invited Riddle to go with him to his camp for dinner. The two started, and *en route* met the witness' brother and wife going from Cuero to Yorktown. Both parties stopped and talked awhile, and the witness and Riddle then started again to the camp. After they had proceeded some distance they heard some one traveling through the bushes, and soon discovered that it was the defendant. He joined the witness and Riddle, and as he rode up, he said to Riddle, "that man (or fellow) is in town." The defendant and Riddle looked at each other for a minute and then the defendant said: "Well, by G—d, I might as well tell you, I killed Benton last night." He, defend-

ant, then said that that morning, while he was standing in a store-door in Yorktown, he saw Van Werk, a constable, coming towards him from across the street, and he thought the constable's intention was to arrest him. He said that he then got on his horse and rode towards Gohmert's tin-shop, across a creek, but saw someone standing in the tin-shop door who looked so much like the deceased that he turned and rode rapidly out of town · to Mrs. Edwards', where he changed horses, and from there rode on to where he met the witness and Riddle. He then described to the witness and Riddle the circumstances of the killing. He said that he went to the camp of the deceased about sundown on the evening before, and told him that he had come to talk to him about an indictment against his, defendant's, brother Amos, for carrying a pistol or stealing a cow. That he got down, tied his horse near by, had some conversation which resulted in some kind of understanding about the indictment, and then they ate supper together, and that no enmity was displayed by either during this time. That after supper, they sat around the fire and talked, and that he noticed that deceased, during all this time, had either a knife or axe in his hand. That he finally told the deceased that he was afraid to stay at home or at Riddle's that night, as he believed the sheriff was after him, and asked the deceased's permission to stay in his camp; to which the deceased consented, and they made their pallets down by the fire, and soon the deceased rolled over and went to sleep. That he then shot him through the back of the head. Riddle asked the defendant, at this point of the narrative, what the deceased did, and what he, defendant, did next. He said that deceased made a kind of gurgling noise in his throat, and that he, defendant, raised up on one elbow and knee, and fired another shot through the deceased's head. That when he fired this second shot his horse broke loose, and that he followed

and caught him in a few minutes, mounted, rode back, and fired two more shots from his horse. That he then threw quilts over the body and set them on fire. That he then rode into Edwards' creek, rode down the bed of it to the mouth, then down Clear creek until he came to a point opposite Riddle's house, where he took a trail, and went up to the house, unsaddled his horse, and went to bed in a back room, where he stayed until morning, and then went to Yorktown.

The witness testified that when this statement was concluded, the three started to Riddle's house, and when they reached a hollow in Anderson's creek, one of the two asked witness to ride to the deceased's camp and see if he was still there. The witness rode to a point within one hundred yards of the camp, from where he heard voices at the camp, and then rode off, going towards Riddle's ranch. In a flat, near Noltke's house, he met Elias Dubose and Riddle, and told them of the voices he heard at the camp, and that he supposed the deceased must be there. From this flat, Elias Dubose, Riddle and the witness rode up to Riddle's house and there they met the defendant. The defendant then saddled a dun mare that had been sold but not yet delivered to witness' brother by Riddle, and rode off in a northerly direction, saying that he was going to some of his relatives up the river. When he started he asked of and received from Riddle a roll of money.

The witness did not see Ned Edwards on that day, but on the next Riddle told him that Edwards had gone up the river after the defendant. On this last mentioned day the witness met defendant and Edwards about a quarter or half mile from McFarland's house. From this point the three went to McFarland's house and sat on the fence awhile, talking of the killing of the deceased. Within a half hour Edwards and defendant rode off. During the conversation the defendant told witness to remember what he had told the day before. When the defendant

made his confession the day before, he told the witness
that if he told, he, defendant, would "get him," and fur-
ther said that if the deceased was not dead, he, defendant,
would kill him yet.    The defendant left Riddle's house
about mid-day, going up the river, and Riddle said some-
thing about sending for him.    The witness did not know
the conditions upon which the defendant was to come
back, but inferred that he was to return on ascertaining
that the deceased was dead.    The defendant had no reg-
ular place of abode, and witness thinks was not on good
terms with the deceased.    The witness saw him in the
evening before the killing, riding towards Riddle's house,
and saw that he and Riddle met some three or four miles
from Riddle's house.

On cross-examination, the witness said that his sheep-
camp was about three miles from the camp of deceased,
and but little farther from Riddle's house.    Himself and
Riddle were on friendly but not intimate terms when they
met on the prairie the morning after the killing.    They
first talked about sheep, and then about the deceased, and
Riddle said that, as he did not like the deceased much, he
was glad that deceased was going to settle up his debts and
leave the country.    From here the witness reiterates his
testimony in chief, and proceeds to state in substance
that himself and deceased occupied different cabins on
Riddle's place in 1874, and had been on good terms, until
they quarreled about a joke.    The deceased pushed the
witness so violently against a buggy wheel during that
quarrel, that his neck was badly hurt and himself ren-
dered insensible for some time.    The two did not speak
for some days, nor until the deceased apologized, saying
that he "was in fun."    The witness could not remember
whether he slept in his camp or on McFarland's porch
the night that the deceased was killed, nor did he remem-
ber what kind of a night it was.    He stayed in the neigh-
borhood, tending his brother's sheep, until the 17th of

November following the killing, and then went to Gonzales county, where he stayed two years. In 1877 he returned to De Witt county and assisted his brother with his sheep, until he went to farm on Crosson's place. He left the county because, one night when he was returning from Shiloh church, he was met in the road by eight men who told him that he knew too much and must leave the county in three days. He could not say whether they wanted him to leave on account of what he knew about this murder, or on account of what he knew about cattle-stealing. He saw the defendant leave Shiloh church that night with some ladies, and did not think he was one of the eight men.

The witness admitted having told Crosson of defendant's confession, or at least part of it, but denied that he had ever told Crosson that he was present and saw the killing. He did not think he had seen Riddle to speak to him for two weeks before the killing, but saw him at a distance on the evening of the killing, about 4 o'clock, traveling towards Yorktown. He did not recollect when he last saw deceased to speak to him, before the killing, but saw him at a distance in the evening before he was killed. He had been in deceased's camp twice, but deceased was not there on either occasion. The witness stated that he had received no money to testify in this case, but that deceased's brother paid his expenses at the previous term of the court.

James Montgomery, for the State, testified that on the morning after the killing he went to Mr. Casprizk's house, *en route* to the camp of the deceased, and inquired of Casprizk the locality of the camp. Receiving directions he rode to the camp and found the deceased dead. He called Casprizk and requested him to stay at the camp with the body until he could bring help. The witness got Mr. Noltke and they returned to the camp, meeting some Germans on the way, by whom he sent word to the cor-

oner at Yorktown. This witness described the condition of the body as it was described by the witness Noltke. There were horse-tracks around, though but one horse appeared to have been tied near the camp. No trail was found by the witness to or from the body. A pistol and knife were found by witness under the head of the deceased; the pistol was cocked and was rusty, as though it had not been fired in a long time. On his way to the camp the witness noticed some men, mostly Mexicans, with a herd of cattle. The witness had an appointment with deceased, to receive some money due him, on that morning, and it was to fulfill this appointment that he went to the camp.

The cross-examination did not change this evidence in any respect, and added little or nothing to it. The appointment to pay the witness at his camp what was due him was made by deceased five or six days before. No one was present at the time, nor had the witness mentioned it to anyone. The witness took charge of the deceased's effects, but found no money, checks or drafts among them.

L. A. Preston testified, for the State, that he knew a certain dun or "clay-bank" mare that had belonged to Riddle. She passed the witness' place with a rider whom he did not know, on the day after the killing, going towards Gonzales county, and was traveling a trail that led in the direction of Louis Dubose's (defendant's uncle) place, in Gonzales county. This was a private trail, used by the families of the Duboses, D. Hunter and Robert Riddle. The witness saw the mare and rider next day, retracing the course of the day before, but did not then recognize the rider.

Cross-examined, the witness stated that he did not recognize the rider on either of the two occasions testified to, but thought he was Riddle from the fact that he rode the Riddle mare.

Ned Edwards was introduced by the State, and testified, in substance, that the defendant came to his house about 9 o'clock on the day after the killing, and that he went to Yorktown with the defendant, and there lost sight of him and saw no more of him that day. The witness was present at the inquest, but did not see the defendant there. After the inquest, the witness went to Riddle's, and from there with Riddle went to Louis Dubose's house, in Gonzales county, that night. Next morning they met defendant at Louis Dubose's, and the three returned, the defendant riding a dun mare which Riddle had sold to the witness Bacquet's brother. The witness did not know the whereabouts of defendant on the night of the killing, but knows that he was not at Mrs. E. Edwards' house. Mrs. Harris, Mary Edwards, now Mrs. Dubose, Alice Edwards, Mrs. Edwards and Elias Dubose were there. Riddle, defendant and deceased had a difficulty some time before the killing, and the latter had had Riddle and defendant indicted for it. The defendant told the witness that if Benton did have him indicted, he would kill him. Defendant told witness this a month or two before the killing, on Cabaro creek. The witness saw Riddle and defendant talking together at Louis Dubose's on Sunday morning next after the Friday night of the killing, but heard nothing they said. As he and defendant exchanged horses frequently on their ride back from Gonzales county, he did not know which was riding the dun mare when they passed Preston's. Defendant told witness at the last term of court not to come to court to testify, in order to enable him to continue his case. Witness did come and answered to his name. Further than this the defendant had said nothing to him about testifying.

On cross-examination the witness admitted that, on the defendant's application for bail, he testified that the defendant was at Mrs. Edwards' house on the night of the killing and stayed there until 10 or 11 o'clock next day.

He admitted that he testified at the same time that he did not go to Louis Dubose's in Gonzales county on the day or night after the killing. He testified then, also, that he did not see Wm. C. Bacquet; all of which was the reverse of what he states on this trial under oath. He was under oath at the *habeas corpus* trial. The reason he testified falsely in the first instance was that he was afraid the defendant would "put him out of the way." The witness had talked with Mr. Hunter about his former testimony and asked him what to do, and was advised by Hunter to tell the truth. The defendant was the witness' brother-in-law when the latter testified under *habeas corpus*. His wife, the witness' sister, has since died. Riddle was married to the defendant's sister at the time of the killing.

The State here introduced two indictments in evidence, one charging Riddle, Elias Dubose and defendant with assault with intent to murder the deceased, and the other charging Amos Dubose with the theft of a cow, the property of the deceased. The State closed.

G. W. Crosson, for the defense, testified that in December, 1877, W. C. Bacquet approached him in Cuero and asked him for employment. The witness employed him, and took him home in his ambulance that night. *En route* they discussed a murder trial that was then in progress in the District Court, and Bacquet told him that he knew of a "worse murder than that," and then detailed the killing of Benton very much as he detailed it in evidence on this trial, but did not at that time tell the witness who did the killing. At the supper-table that same night, Bacquet repeated the narrative of Benton's murder in the presence of the witness' family. When he first gave the witness the particulars of the killing, the witness asked him "how he knew of it?" and he replied that he saw it and was near enough to hear the shots, and that the man who did the killing, immediately after kill-

ing the deceased, started to kill him, but that he begged off, and defendant threatened to kill him if he told of the killing.

Cross-examined, the witness said that he told Mr. Creswell that Bacquet knew of a wilful murder, and that it ought to be investigated. He thinks that he also told Creswell that Bacquet was present when Benton was killed. He denied having told Creswell that Bacquet said that defendant confessed the murder to him.

The substance of the evidence of Elias Dubose, for the defense, was that the defendant stayed all the night of the killing at the house of Mrs. Elizabeth Edwards. There were present at Mrs. Edwards' house during that night, the witness, Miss Mary Edwards, Alice Edwards, afterwards wife of witness, now dead, the widow Harris, afterwards defendant's wife, now dead, Ned Edwards, witness and defendant. Mary Edwards, now Mary Dubose, was sick in bed at the time of this trial, and Mrs. Edwards insane. The witness went to bed at 10 or 11 o'clock, and defendant was then there. He was there early next morning, and witness thinks all night.

Cross-examined, the witness said that he hunted horses next day after the killing until late evening, and with his wife then went to Riddle's. He did not see Riddle until he got to his house, nor did he see Bacquet for three or four weeks afterwards. The defendant was at Mrs. E. Edwards' on Friday evening (the evening of the night on which deceased was killed), and, on Saturday evening, when witness started to Riddle's. Ned Edwards told the defendant of the killing on Saturday evening, and the witness thinks that Ned Edwards went to Yorktown that day, and alone. The witness knew the deceased well, and they were friendly, and took supper together at Mrs. Edwards', where the witness lived, a few days before the killing. There was an indictment against the witness for assault to murder the deceased, but the witness did not

know of it until after the death of the deceased. Witness had never been arrested and had given no bond, but, as he was told by the sheriff to do, he went to court. He thinks the indictment has been dismissed. He denied that deceased had ever had a difficulty with him, or with Riddle and defendant, in his presence.

Mrs. Robert Riddle testified for the defense that she was at home on the night of the killing, and heard shots in the direction of Benton's camp, about 9 o'clock. Her husband came home about 9 o'clock that night, after the shooting, and told her he had been on "'Sandies." She was at home all of the next day. No one came to the house until about dark, when Elias Dubose and his wife came. W. C. Bacquet was not at the house the day after the killing, nor did she see him that day.

Cross-examined, she said that her husband, Robert Riddle, having come home on the night before and after she heard the firing, remained at home all next day, Saturday, Saturday night, and Sunday. She did not see the defendant for two weeks after the killing, nor had she seen him in two weeks before, as he seldom came to her house. She is a sister of defendant.

Hon. H. C. Pleasants, trial judge, testified for the defense that the evidence of Mrs. Harris, *nee* Mary Edwards, given at the trial for bail under writ of *habeas corpus*, was corroborative of the testimony of Elias Dubose on this trial. Ned Edwards, on the trial for bail, contradicted the witness Bacquet, and testified then as he said on the present trial he had testified.

The defense introduced the minutes of the court, and showed thereby that at the December term, 1878, the two indictments offered in evidence by the State were dismissed.

In rebuttal Henry Creswell testified that, a short time before the indictment of defendant for the murder of deceased, G. W. Crosson told him that W. C. Bacquet

had told him, Crosson, that Bacquet knew of a murder, and that it ought to be inquired into. He further told the witness that Bacquet told him, Crosson, that defendant had told him, Bacquet, that he, defendant, killed the deceased. Crosson did not tell witness that Bacquet said he was present and saw the killing.

On cross-examination, the witness thought but was not certain that Crosson told him that Bacquet said that defendant confessed to him, Bacquet, that he, defendant, killed the deceased. He is certain, however, that Crosson did not tell him that Bacquet said he was present and saw the killing.

It appears by a bill of exceptions that the defense, in connection with Crosson's testimony, proposed to introduce John Waters as a witness, and to prove by him that the deceased Benton, and Bacquet, the main witness for the State, were at enmity and had had a serious difficulty; that Bacquet habitually carried arms for Benton and threatened to take his life.

The jury found the appellant guilty of murder in the first degree, and assessed a life-term in the penitentiary as his punishment.

*Staytons, Lackey & Kleberg,* for the appellant, filed an able brief.

*Horace Chilton,* Assistant Attorney General, for the State.

*R. Kleberg & S. F. Grimes,* also for the State. The inadmissibility of evidence to show threats by a third party to take the life of the deceased for the murder of whom a defendant is on trial, was definitely settled in the cases of *Boothe* v. *State,* 4 Texas Ct. App. 202, and *Walker* v. *State,* 6 Texas Ct. App. 601. The issue of the trial in such cases is the guilt or innocence of the defendant on trial.

Defendant's 7th bill of exception embraces a broad and general objection to the court's charge to the jury, as not being the whole law applicable to the facts in the case. We will first, in connection with the general charge, consider defendant's 8th bill of exception and his special charge refused by the court, which defendant deems part of the law applicable to the facts of the case, as defining the rule of law that the testimony of a *particeps criminis* must be corroborated, etc. It is a well settled principle of law that, in order to necessitate a particular instruction, the issue must arise fairly and naturally from the evidence, without remote and strained presumption; and from all that appears on the face of the record of this cause the relation of principal or accomplice between the State's witness and the accused did not exist. The mere hearsay testimony of G. W. Crosson as to Bacquet's statement outside of court, that he, Bacquet, was near enough to hear and see the shooting, does not create such a relation; and does not necessitate an instruction on that point. The testimony of G. W. Crosson, if it were competent to show that Bacquet was a principal or accomplice, would show the very reverse, and prove conclusively that Bacquet was an accidental witness whom defendant, when he discovered him, threatened to kill — a witness who begged for his life when he was detected by the defendant, after he, defendant, had committed the murder, and whom defendant only spared on the condition that he would never tell.

The concealment (says Mr. Wharton on Homicide, 2d edition, secs. 345–46) of the knowledge that a felony is to be committed will not make the party concealing it an accessory before the fact, nor will tacit acquiescence or words which amount to a bare permission be sufficient to constitute this offense. But we take it that the testimony of G. W. Crosson can have but one legal significance, and that it is to contradict generally the testimony of W. C.

Bacquet by statements which said Bacquet had made to said Crosson outside of court. In every other sense it was hearsay and could not be used to show that the said Bacquet was an accomplice. *Krebs* v. *State*, 8 Texas Ct. App. 27. Defendant's special instruction, then, while it clearly indicated the theory of the defense, had no application to the facts, and was no part of the law of the case.

Hurt, J. John Dubose was charged with the murder of James Benton; was tried and convicted of murder of the first degree, and his punishment assessed at confinement in the penitentiary for life. There are a number of points raised by the assignment of errors; but we think that the determination of three will be all that is necessary to a proper disposition of the case.

1st. Under the surroundings of this case, had the defendant the right to show motive, threats and opportunity on the part of the State's witness Bacquet to kill the deceased?

2d. Was the defendant, under the circumstances in this case, entitled to prove facts and circumstances tending to fasten guilt upon some other person?

3d. Did the court err in charging the jury, that "In every criminal prosecution the accused is presumed innocent until his guilt is established by legal evidence, and the burthen of proof must rest upon the State, and does not shift till the State has proved, to the satisfaction of the jury, the facts which constitute the offense charged, and when this is done it then devolves upon the accused to establish that upon which he relies to excuse or justify the prohibited act?"

First proposition. One Bacquet was a very important, in fact, the main witness for the State. Besides his evidence there is no fact tending to produce anything more than a bare suspicion against the defendant. The record

contains some evidence inculpating this witness. The defendant offered other evidence upon the trial, tending to connect this witness with the murder. This evidence consisted of motive, threats and opportunity to kill the deceased Benton. To the introduction of these facts the State objected, and the court below sustained the objection; to which ruling the defendant excepted and reserved his bill of exceptions.

If the witness Bacquet were an accomplice, the defendant could not be legally convicted upon his evidence, unless corroborated in a certain manner; and if this corroboration failed, no conviction could be had on the evidence of this accomplice. The defendant's guilt may have depended entirely upon this fact; hence the proof of this fact, to wit, that Bacquet was an accomplice, is a full and complete defense to the prosecution. Again, if there was no corroboration as the law requires, a doubt as to whether he was *not* an accomplice would have been a good defense; for a doubt of a fact upon which guilt *necessarily* depends is a doubt of guilt.

The defendant having clearly the right to show that the witness Bacquet was an accomplice, by what character of evidence must he prove it? Is he confined to positive evidence, or may he enter the field of circumstances? He would have the right to attack, with every character and description of legal evidence, any other fact upon which his guilt depends. Why restrict in this case? If successful, is not the defense made legal by the law of the land? There being none against, but, in our opinion, every reason in favor of, a full and complete range of investigation, we are of the opinion that, to establish that the witness was an accomplice, the defendant had the right to introduce every character of evidence, whether positive or otherwise, which would have been admissible if the witness had been on trial for the murder. This will be again referred to and more fully noticed below.

The second proposition: "Was the defendant entitled, under the peculiar character of this case, to introduce evidence tending to prove that some other person killed the deceased?" This is a case of circumstantial evidence, except the confessions sworn to by Bacquet. The authorities are divided upon this subject, and we think the weight is against the admissibility of the evidence. Later decisions, however, are leaning in its favor. The question with the writer is,—"Upon which side is reason and justice? for, it being impossible to reconcile the authorities, we must look to the reason and analogies of the law for a proper solution of the subject. As preliminary to the main point, we will here state that, in a case in which the killing by defendant is not the vital issue, it being conceded, this evidence would be inadmissible. But the issue being, did the *defendant* kill the deceased, under this issue is this proof competent? We think, by a plain and simple illustration, its admissibility can be demonstrated.

Suppose that A is indicted for the murder of B. Upon the trial the State proves by two witnesses that they were present at the homicide, and saw A kill B. B denies the killing, and proposes to prove by a witness who was also present that C killed the deceased. Would any court hold that this evidence was not admissible? Certainly not. Now suppose the State were to propose to prove that A had a motive for, and threatened to kill B. This would be clearly admissible, not only for the purpose of proving malice, but to strengthen and corroborate the evidence for the State "that A did the killing." The State having drawn upon motive and threats, the defendant would have the same right, and could, therefore, prove motive and threats on the part of C to kill B.

But suppose that the State leaves positive evidence and enters the field of presumptions from circumstances,— the case being one of circumstantial evidence alone,— can not the defendant follow in her wake, and enter the

same field, and show by circumstances that C did the kill-ing? Again:— B is found dead on the roadside (suicide being out of the question), killed with buck-shot; the State proves that the defendant was seen leaving rapidly from the direction of the body, and that he had a strong motive and had seriously threatened to kill B; that he was armed with a shot-gun, and a number of other suspi-cious circumstances surrounding him. He fails to explain these inculpatory facts. With these facts the State seeks to convict him. Upon the trial the defendant proposed to prove that C was seen going rapidly from the direction of the body, and with a shot-gun, and that he had also a motive and had seriously threatened to kill B. The phys-ical facts, at the place of the murder, show that but one person did the killing. The defendant is not permitted to prove these facts and is convicted. The State then prose-cutes C, and as he could not be allowed to show the facts upon which the first defendant had been convicted, he would also be convicted. It being certain that but one person did the killing, this illustration demonstrates that a terrible wrong has been committed upon one of these parties.

The grand and fundamental error, in this whole matter, consists in the fact that courts proceed upon the idea that absolute certainty can be attained by means of circum-stantial evidence. And strange to say, they give to and surround circumstantial evidence with more sanctity and infallibility than is accorded to positive evidence. For we have found that, when the State relies upon positive evidence, the defendant may, by the same character of evidence, show that some other person killed the deceased. There is another peculiarity attending this subject; which is that the circumstances in *behalf* of the State are those which cannot be attacked by *other circumstances*. This process of reasoning leads to the conclusion that the pro-bative force of a fact depends upon which side proposes

to use it; or, to present it in a different shape, if C were on trial these same rejected facts would become pregnant inculpatory facts, but as the defendant and not C is on trial, they lose their probative force and become immaterial.

By reference to *Walker* v. *State*, 6 Texas Ct. App. 601, *Boothe* v. *State*, 4 Texas Ct. App. 202, and a long list of cases sustaining these decisions, it will be found that this proposition is stated, "That the issue of the trial was the guilt or innocence of the *defendant* on trial." This position would unquestionably be correct, if the guilt of another person, in no state of case, could tend to weaken the evidence adduced against the defendant. The guilt of the defendant is the issue in every criminal prosecution. The proposition asserts nothing from which any conclusion can be made bearing upon the question. To our mind it is assuming and begs the question. Who will assert that there are no cases in which, if the guilt of another were shown, the case as made by the State against the defendant would not be completely crushed? But such investigation, with reference to other parties than the accused, should not be permitted in cases either positive or circumstantial, unless the inculpatory facts are such as are proximately connected with the transaction. In other words, to show remote acts or threats would not be admissible unless there were other facts also in proof, proximately and pertinently connecting such third party with the homicide at the time of its commission. If, then, the guilt of another party is an attack upon, or raises a doubt of, the truth of the case as made by the facts against the defendant, evidence tending to prove this guilt is clearly admissible. The office of evidence is to satisfy the mind of the truth of a given proposition, and in criminal prosecutions that proposition is always the guilt of the accused.

There is an inconsistency, glaring and patent, in rela-

tion to this subject. If the case be one of positive evi-
dence, the defendant is permitted to prove by positive
evidence that some one else did the killing. Would not
the guilt of the *defendant* on trial *be the issue* in that
case? Certainly. The effect of positive proof that some
other person killed the deceased is to draw in question or
surround with doubt the affirmative proposition "that
the defendant killed the deceased." If the case made by
the State with positive evidence can thus be met, why
not, in cases purely circumstantial, permit the defendant
to meet the case by the same character of evidence, and
show that another committed the homicide? Can the
conclusion drawn from circumstantial evidence be more
certain than that made from positive evidence? We think
not.

We are, therefore, of the opinion that, when the issue
on the trial is whether the *defendant* did the killing, he
has the right to show that some other person committed
the homicide, by the same character of evidence relied
upon by the State for a conviction. If, however, the
facts show that more than one person participated in the
homicide, this evidence would possess no tendency to
weaken the case as made by the State, and should there-
fore be rejected, unless under peculiar circumstances
which we will not attempt to give at this time. A most
excellent statement of the rule is made in *Means* v. *State,*
decided at this term by our presiding judge. *(Ante,*
p. 16.) It is thus stated: "The rule is that such evidence
affords no reasonable presumption or inference as to the
guilt or innocence of defendant, and it is generally treated
as hearsay or *res inter alios acta.* Of course the rule has
its exceptions, but they can exist only in cases where the
evidence is wholly and strictly circumstantial, and where,
the mind having nothing to rest upon, seeks knowledge
and light from every source, however dim, calculated to
throw light upon the transaction."

The exception is made in cases purely circumstantial. Suppose, however, that the State relies in the first instance upon positive proof, and the defendant meets that proof with positive evidence that some other person killed the deceased; now, in corroboration of their witnesses either party would have the right to prove motive, threats, and in fact all other inculpatory facts. The parties having left the field of positive evidence, and entered that of circumstantial, the rule as stated by the presiding judge does not conflict, but is in accord with the admissibility of the evidence in the illustration last made. See the case of the *United States* v. *Hartwell*, 3 Clifford, 221, for a departure from the old rule on a question analogous to this. Also *Means* v. *State*, decided at this term, *supra*.

The third proposition is, did the court err in charging the jury " That in every criminal prosecution the accused is presumed innocent until his guilt is established by legal evidence, and the burthen of proof rests upon the State, and does not shift till the State has proved, to the satisfaction of the jury, the facts which constitute the offense charged; and when this is done, it *then devolves* upon the *accused* to *establish* the facts upon which he relies to *excuse* or justify the prohibited act." It then devolves upon the accused to *establish the facts upon which he relies*, etc. In order to prove or establish a fact it must be done by evidence sufficient to lead a jury to believe it, and for this reason it must outweigh or preponderate the evidence which it is adduced to meet and control. Here, then, we have two affirmative propositions in one criminal case; first, the State must prove the facts constituting the offense charged; and second, then the defendant must satisfy the jury that these facts are not true,— take the burden, and convince the jury that the case as made by the State's evidence is untrue.

The "facts upon which he relies to excuse or justify" must be established; this unquestionably means that they

must be proved, and, if they must be proved, a preponderance of evidence in their favor must be adduced by the defendant. They may have been of sufficient strength to have created a reasonable doubt of the truth of the facts relied upon by the State, but this would not be establishing or proving them. It cannot be questioned that it devolves upon the State to establish by evidence the guilt of the accused beyond a reasonable doubt, and that the defendant, by his plea of not guilty, puts in issue every material allegation in the indictment. Now, is he required to plead specially any matter of justification or excuse? There is but one affirmative proposition in the case, and that is the guilt of the defendant. It is not divided into two parts; one of guilt as charged by the State, and the other of innocence supposed to be asserted by the defendant. He does not affirmatively plead that he is innocent, but denies that he is guilty, and the case is tried upon that issue throughout. The jury are not required to believe him innocent in order to acquit; the question is guilt, and not innocence; and this issue is affirmative in its very nature, and continues so throughout the whole trial. The correct principle is that when the defendant relies on no separate, distinct and independent fact, but confines his defense to the original transaction on which the charge is founded, with its accompanying circumstances, the burden of proof continues throughout with the prosecution.

What independent, separate and distinct fact was relied upon by the defendant in this case? None whatever. The issue, the struggle throughout the whole trial, was as to whether the *defendant* killed James Benton. There is not the slightest hint in the whole record at an excuse or justification of the killing. The theory and the only theory of the defense was that the defendant did not kill the deceased. The effect upon the rights of the defendant must have been terribly damaging, indeed, from such

a charge. It presupposed that the defendant had killed the deceased, and called upon him to excuse or justify; thus assuming the existence of the very fact upon which the whole fight was made. The jury were in effect told by this charge that the State has shown that the defendant killed the deceased, and it now devolves upon him to excuse or justify the killing; thus assuming the very fact in issue in favor of the State, and shifting the issue to something else not presented by the evidence, nor thought of by the defense. We are, therefore, of the opinion that this charge was not proper under the case, as made by the evidence. *Wingo* v. *State*, 66 Mo. 181; *Stokes* v. *People*, 13 American Rep. 492; *Mohaher* v. *People*, 10 Mich. 212; *State* v. *Morphy*, 33 Iowa, 270; *State* v. *Norten*, 34 Iowa, 131; *State* v. *Underwood*, 57 Mo. 49; American Criminal Law, sec. 707; *Commonwealth* v. *McKie*, 1 Gray, 61; *Ake* v. *State*, 6 Texas Ct. App. 398; *Ainsworth* v. *State*, 8 Texas Ct. App. 532.

We will not discuss the question as to whether this or a similar charge can properly be given in any case, except in those in which an independent, separate and distinct matter is interposed. The writer is of the opinion that it is not permissible in any case, unless such matter is relied on. That this charge in this case is not proper is held by all the judges of this court.

For the errors above pointed out, the judgment is reversed and the cause remanded. The other points raised by the assignment of errors will not likely arise again.

*Reversed and remanded.*